Denio, J.
 

 The corporation of the city of New-York constructed, at its own expense, the extension of the pier No. 23, against which extension the plaintiff’s vessel lay while it incurred a charge of $20.25 for wharfage, in May, 1843. If the corporation was entitled to that wharfage, the defendant Guion, as its lessee, had a right to distrain for it; and this action, which was brought on the assumption that the distress was illegal, cannot be sustained. (2
 
 R. L.
 
 1813,
 
 p.
 
 430, § 217.) In order to apply the different provisions of the statute respecting docks, slips and piers, it becomes necessary, in the first place, to settle the question as to the ownership of the ground opposite to the pier when it was originally constructed, in the year 1841 or 1842. On the 14th day of January, 1804, the mayor, aldermen and commonalty conveyed, in fee, to Daniel Seedlon, Francis Lewis and Daniel C. Verplank, described as executors of Robert Crommelin, reserving a ground rent of fifty dollars per annum, a piece of ground under water, extending from Front street to South street, and being fifty feet in breadth and about one hundred and forty-eight feet from street to street. South street was then only an imaginary space, nothing having been done towards its construction at this point; but its location was indicated by a diagram, which is referred to in the grant; and the whole of the granted premises, as well as the contemplated street, were then at the bottom of the Bast river. The grantees covenanted to construct South street seventy feet in breadth, directly beyond and adjoining the whole river front of the premises granted, and
 
 *460
 
 perpetually to keep it in repair; and the conveyance declared that it should remain “ a public street or highway for the inhabitants of the city and all others passing or repassing through or by the same, in like manner as the other public streets of the said city now are or lawfully ought to be.” The grantors covenanted that the grantees, their heirs and assigns, paying the rent aforesaid, and keeping the covenants on their part, should forever have the benefit of the wharfage and cranage, and other advantages and emoluments growing or accruing by or from the said wharf or street called South street, fronting on the East river, opposite such granted premises, as freely as the corporation had a right to grant the same. This provision respecting South street was inserted in the conveyance, to carry out the requirements of an act of the legislature of an early date, which are repeated in the revisions of 1801 and 1813. (2
 
 Webs, Lams, p.
 
 127, §§ 3,4, 5, 6; 2 72.
 
 L.
 
 1813,
 
 p.
 
 432, § 220
 
 and
 
 seq.) By these enactments, the corporation was authorized to lay out regular streets or wharves seventy feet wide, according to a plan which had been agreed upon, in front of those parts of the city adjoining the East river, and also adjoining the Hudson river. These streets were to be constructed by the proprietors of land
 
 “
 
 adjoining or nearest and opposite” the street or wharf, in proportion to the breadth of their respective lots, and when the nearest lots did not come down to the place where the street was located, the proprietors were to fill up the intervening' spaces, and thereupon became the owners quite to the street or wharf. Should the owners- of lots neglect or refuse to make the improvement, the corporation was to cause it to be done, and the expense of filling up the spaces and of constructing the streets was to be assessed upon the proprietors of the lots, and was made a lien upon such lots, which were to be sold, if necessary to raise the amount. The pier No. 23 is thirty feet wide. It springs from the easterly or river side of South street, directly opposite the lot granted to the executors of Crommelin, and runs into the river at a right angle with South street. Lines corresponding with the exterior lines of the pier, if extended across
 
 *461
 
 South street, would fall within the land embraced in that grant at its easterly boundary on South street. In March, 1816, a statute was passed reciting that the corporation had memorialized the legislature, setting forth that it was desirious of acquiring the title to a piece of ground, which is described, (and which embraces a part of the grant to Crommelin’s executors,) for erecting thereon a public market, and for other public purposes, and that it was willing to defray the whole expense of the purchase out of the city treasury, upon said premises being vested in the corporation in fee simple; whereupon, provision was made for the appraisement, by commissioners to be appointed by the supreme court, of the loss and damage to the respective owners of those premises, by and in consequence of relinquishing the same to the corporation; and it was enacted that upon the confirmation of the report, the corporation should become and be seised in fee simple absolute of all the lands, tenements, hereditaments and premises in the report mentioned; and that in all cases when any lot or parcel of land
 
 “
 
 under lease or other contract,” should be taken pursuant to the act, “ all the covenants, agreements, conditions and engagements touching the same or any part thereof,” should, upon the confirmation of the report, respectively cease and determine and be absolutely discharged. Provision was then made for the payment of the amount of the appraisal.
 
 (Laws
 
 1816,
 
 p.
 
 52.) Pursuant to this act, the corporation became the owners of the land southerly of Crane-wharf street, on the lower boundary of which was a public slip. The land was taken and appraised, and the report confirmed, December, 1818.
 

 Under the act of 1813, (2
 
 R. L.
 
 408, §§ 177, 178,) Beekman street was extended to South street. The report was confirmed in 1819. The land taken by this extension and thus forming a part of Beekman street lies directly opposite pier Ho. 23, and embraced the whole of the Crommelin grant, except a strip twelve and one-half feet wide, and extending from Front to South street, lying on the east side of the Crommelin grant. That strip of land, and another piece of the same dimensions, belonging to other parties, lying still easterly of it, constituted what
 
 *462
 
 was called Grane-wharf street, which, before the opening of Beekman street, and the building of South street, ran from Front street to the East river. The portion of the Crommelin grant, which was taken and appraised, together with Grane-wharf street, was laid out into a street, and thence became an extension of Beekman street. The east end of Beekman street on South street, if extended across the last mentioned street, would more than cover the whole southerly end of the pier. Indeed, the whole of what was formerly Grane-wharf street, lies easterly of the range of the west side of the pier. Upon these facts, I am of opinion that the 224th section of the act contained in the revision of 1813, had no application to the construction of this pier. (2
 
 R. L.
 
 433; § 7
 
 of the act of
 
 1801.) That section, which in the order of several statutory provisions on this subject follows the directions respecting the exterior streets or wharves, provides that it shall be lawful for the corporation to direct piers to be sunk and completed, at such distances and in such manner as they in their discretion shall think proper, in front of the said streets or wharves [the exterior streets or wharves before referred to], at the expense of the proprietors of the lots
 
 lying opposite to the places
 
 where such piers shall be directed to be sunk. If such proprietors shall neglect to construct the piers at the time appointed by the mayor, aldermen, &c., the latter may construct them at their own expense, and in that event may take the wharf-age, &c., arising from them, to their own use, or may grant it to others. Section two hundred and thirty-one provides in substance, that when there are several proprietors of lots lying opposite the place where a pier is to be sunk, and some of them refuse to join with the others in constructing the pier, the corporation may itself join with those who are willing to participate in the expense, and thereupon it shall become entitled to the proportion of wharfage which would have belonged to the delinquents if • they had united in the work. The next section (§232) enacts, that the notice to the proprietors of lots, of the directions of the corporation for the constructing of piers, may be by an advertisement, published for six weeks in two newspapers. As the
 
 *463
 
 city itself was the proprietor of the lots opposite the place where this pier was to be constructed, the corporation had no directions to give to any private proprietors, and no publication to make respecting them. The three sections referred to had no application whatever to the state of things which existed when the corporation embarked in the enterprise of constructing pier No. 23. I have not overlooked the argument of the plaintiff’s counsel, in which it is attempted to be shown that the executors of Crommelin, by constructing South street in front of their grant, acquired an ownership of the bulkhead, which entitled them, under the seventh section of the act of. 1801, (corresponding with the 224th section of the act of 1813,) to construct the pier projecting from that place, and to have the emoluments arising from it. But I am not able to assent to that position, for the following reasons: (1.) Neither the act of the legislature nor the conveyance to the executors of Crommelin, contemplated any individual proprietorship of the bulkhead. It was to be and continue a public street, for the use and benefit of the whole public. The sections last referred to speak of the
 
 “
 
 proprietors of lots” lying opposite the place where piers are to be sunk, as the persons who are to pay the expense and be entitled to the wharfage of the piers. The language cannot be applied to the owners of an incorporeal right annexed to a public erection. It is in no just sense the ownership of a lot. (2.) I am of opinion that the right of wharfage, &c., secured by the grant to the executors of Crommelin, was extinguished by the act of 1813, and the proceedings under it. This right of wharfage was a servitude annexed to the estate of the owner of the land granted to the executors of Crommelin upon and over the land on which the bulkhead was built, and either passed to the corporation as the grantees of the first mentioned land, upon the same being taken for the extension of Beekman street, or was extinguished by the union of the dominant and servient estate.
 
 (Hills
 
 v.
 
 Miller,
 
 3
 
 Paige,
 
 254;
 
 Child
 
 v.
 
 Chappel, Court of Appeals, Dec. Term,
 
 1853.) The enactment in this respect was not constitutionally objectionable, because ample provision was made for compensation,
 
 *464
 
 not only for the land taken, hut for all damages consequent upon the appropriation. (2
 
 E. L. of
 
 1813,
 
 p.
 
 417, § 181.) It does not appear in what manner the corporation acquired the right to Crane-street wharf, whether by dedication or by purchase, or appraisement under the act of 1813. We find it relinquished to them and appropriated to public purposes, and in the absence of any evidence upon the point, the presumption would be that they had acquired it in some legal manner. If the foregoing positions are correctly stated, the corporation had a right, so far as any private proprietors were concerned, to construct pier Ho. 23, of their own authority; and when private rights are not interfered with, they had a general authority, as a municipal corporation, to lay out wharves and slips whenever and wherever they should deem it expedient. They had even a right to take private property for that purpose, observing the provisions respecting compensation which the law had provided.
 
 (Montgomery Charter,
 
 § 37; 2
 
 R. L.
 
 431, § 219.)
 

 If the corporation had originally constructed this pier, without the concurrence of any individual proprietors, on the ground of the ownership by the city of the lot on which it abutted, I should see no objection to their extending it further into the water, if, in their judgment, such extension was required by the public good. But it was not constructed on that principle, and it therefore becomes necessary to examine some other provisions of the statute. By the 225th section of the act, (2
 
 R. L.
 
 433,) the corporation is empowered to grant to the owners of lots fronting on the exterior wharves or streets, a common interest in the piers to be sunk in front of such streets, in proportion to the breadth of their respective lots, under such restrictions and regulations, and within such limits as the corporation shall deem just and proper. This authority appears to me to apply to cases such as I have supposed this to be, where there are no private proprietors opposite to the place where the piers are to be sunk, and when the corporation might therefore construct the pier at the expense of
 
 the
 
 city and take the fruits of it, and also to cases where the private proprietors, having the right to construct the
 
 *465
 
 pier for their own benefit, had declined, after legal notice, to avail themselves of the privilege. In either of these cases, the corporation was at liberty to elect to take the enterprise wholly into the hands of the city, or propose it to the proprietors fronting on South street, within a district to be defined by the corporation. The provision is broad enough to authorize the proposition .which was made to the proprietors on South street, between Crane-wharf street and Peck slip, by the resolution of July 9,1821. That resolution and the subsequent proceedings, including the assent of the proprietors of the district above referred to, evidenced by the payment of their portion of the expense, establishes an agreement between the city authorities and these proprietors, to the effect that the latter should pay twro-thirds, and the city corporation one-third of the expense of the pier, and that the proprietors should take the emoluments arising on the easterly side and one-half of the head of the pier, and the city the residue of the emoluments. The pier was constructed and paid for under this agreement; and whether the proceeding was authorized by section 225, as I have supposed, or as an enlargement of a slip under section 230, as the common council seem to have considered, or if it depended for its validity merely on the assent of the parties, it still established the legal right to wharfage, and the division thereof between the corporation and the proprietors, according to the proposition of the corporation, as thus assented by the proprietors, and came into effect by the mutual co-operation of both parties. The respective rights of the parties to the original pier being such as I have stated, it becomes necessary, in the next place, to inquire as to the effect of the extension which was made in 1841.
 

 If the proprietors who had co-operated in the original construction of this erection, had again contributed their portion of the expense of the extension, the rights to wharfage would have been preserved as they existed in respect to the pier before its extension. This was so held, in effect, by this court, in
 
 Thompson
 
 v.
 
 The
 
 Mayor,
 
 &c. of New- York,
 
 (1
 
 Kernan,
 
 115.) But they did not so contribute. Was there then any legal manner by
 
 *466
 
 which the corporation could proceed with this enlargement
 
 in invitam,
 
 as upon the default of the proprietors, and construct "the extension at its own expense and for its own emolument ? This was clearly the view of the common council; and it was for the purpose of compelling a contribution or establishing a default of the proprietors upon which it might proceed, that the notice mentioned in the case was published. But the notice had no legal eifect whatever. No provision of law contemplated a notice by advertisement to the joint proprietors of piers. Besides, this notice was for a less extensive work than the one actually constructed; (see 4
 
 Denio,
 
 581;) and, moreover, as has been shown, the only notice contemplated by the statute, was one directed to the owners of lots lying opposite the place where a pier was to be sunk, and who had an absolute right to construct the whole work, and have all the emoluments. But actual knowledge of this intention of the corporation was brought home to the proprietors, and this appeared in the proceedings before the common council. The corporation tendered to them the right to unite .in the expense, to the extent, of two-thirds thereof, and to have the same rights of wharfage which they had in the original pier. This they declined, and the corporation then constructed the extension at its own expense, and it now claims to be entitled to all the emoluments arising from it. After much reflection, I have come to the conclusion that the corporation was warranted in this by the true interpretation of the provision respecting the enlarging of slips.
 
 (Laws
 
 1806,
 
 p.
 
 395, § 2 ; 2
 
 R. L.
 
 435, § 230.) In
 
 The Corporation
 
 v.
 
 Scott,
 
 (1 Caines, 543,) decided in 1804, the supreme court determined that the corporation could not direct the construction of a pier by the proprietors of lots opposite to its side, and reserve to itself a right to the wharfage to arise on the side of the pier adjacent to the slip formed thereby. This determination, as it is supposed, led to the passage of the provision respecting slips in the act of 1806. It declares that when the corporation shall think it for the public good, to enlarge any of the slips of the city, it shall be at liberty and have full power to do so : and
 
 *467
 
 upon paying one third of the expense of the necessary pier, &c., it shall be entitled to the slippage at the inner side, and one half of the wharfage at the outer end. This provision was contained in the act of 1813. I am of the opinion, in the first place, that this power was not limited to the then existing slips, but applied to all such as should exist in the city when the power came to be exercised. The object being to facilitate commerce and navigation, the exigency of the case required that the power should be a continuing one, to be exercised whenever circumstances should arise requiring its application. But the provision does not specify who shall pay the other two thirds of the expense; and in that respect it is singularly defective. It, however, evidently supposes that there may be riparian proprietors who, under prior laws, had certain rights in the emoluments of wharfage at the place where the pier is to be erected, and who would be willing to unite with the corporation upon the terms stated. But what is to be done in case they decline thus to unite ? The statute is silent. Upon the plaintiff’s construction, the power in that event cannot be exercised. But it is a power conferred for the public benefit, and such a construction should, if possible, be given, as to secure the public object. The language clothes the corporation in terms with full power to enlarge the slips, by constructing piers. If it had stopped there, the right would have been without qualification, except such as would arise out of the inability to take private property without cpmpensation. If that were necessary, there would have to be an appraisal under section 219, and the compensation would have to be paid. I think the remainder of the section is intended to provide, that if the private owners will contribute two thirds of the expense of a pier, constructed with a view to enlarge a slip, such owners shall be entitled to all the emoluments arising from the wharfage, except 'that at the side next the slip and one half of the end; that in. that event the corporation shall contribute one third of the expense, and have the emoluments arising at the places last mentioned. But I do not think the improvement can be prevented by the refusal of
 
 *468
 
 the proprietors to unite with the corporation. In case of such refusal, I am of opinion that the work may be carried on at the expense of the city, and that when completed it will belong to the city. When a portion only of the advantage of the pier is given to the proprietors, and that only upon their defraying a portion of the expense, it would be a violent construction which should hold that they should be entitled to the prior rights, though they paid nothing and the corporation paid the whole.
 

 As the proprietors were, before the extension, entitled to half the wharfage at the outer end of the original pier, and as that right was subverted by the extension, it may be that the right thus taken away or destroyed should have been appraised. But this case does not require us to decide that question. If there has been any invasion of the rights of the proprietors in that respect, the law provides an appropriate remedy. That remedy does not consist in vesting in the proprietors of the rights taken away, similar rights arising at another place, and which may be of very different value from those of which they have been deprived. By the'agreement under which the pier was first built, the proprietors of lots became entitled by contract to wharfage at half the outer end. Whether there was an implied condition, that such right should be subject to the necessity which, in the course of years, might arise, of putting an end to the wharfage at that place by an extension, or whether it was implied that the pier should remain forever as it was then built, is a question not necessarily involved in this case. Whichever way it may be decided, the proprietors cannot make title to any part of the extended pier, or to any right of wharfage arising upon it. The plaintiff, a ship-owner, caused his vessel to be fastened to the extended pier, and thus became liable to pay wharfage. He may show, to avoid the defendant’s claim to distrain, that the pier belonged to another, under whom the defendant has no title, but he cannot be permitted to allege that other parties were injured by the erection of a pier, unless he will go farther and maintain that the consequence of such injury was to confer on
 
 *469
 
 the injured party an actual title to the structure, by the erection of which the injury was inflicted. This he cannot do, and he cannot therefore resist this distress.
 

 The judgment should be reversed and a new trial ordered.
 

 Judgment accordingly.